OPINION OF THE COURT
Edward M. Horey, S.
The proceeding before the court is one for construction of paragraph third of the will of the decedent. It has a long and checkered history before the court. The facts, not complex in themselves, but made so because of the number of parties and their constantly altering positions, unfortunately, require review in detail to do justice to all. The legal issues presented are unusual and present questions of procedure as well as substance, not typically found in probate proceedings.
Under paragraph third of his will, the testator bequeathed his residuary estate, valued upon the accounting at $50,393.65, to "The Franciscan Fathers, Christ the King Seminary, St. Bonaventure University, Olean, New York, with the request that High Masses be said for the repose of my Soul and the repose of the Soul of my said wife Genevieve m. beckley”.
The question of the identity of the residuary legatee or legatees first arose on proceedings for judicial settlement.
A chronological recitation of the protracted procedural aspects attending the construction proceeding and preceding an evidentiary hearing thereon has been omitted for the purposes of publication. Many of these are alluded to in the decisional portions which appear hereafter.
On October 18, 1976, court was convened on the construction proceeding pursuant to order for the purpose of taking such proof and making such decree as justice requires pursuant to provisions of SCPA 1420 (subd 1).
The attorney for the executrix was called as a witness. His testimony, given without objection, was as follows: He was the scrivener of the will; he had known the testator and his wife for several years and had been their attorney on prior occasions; he had drawn the will of the testator’s wife as well as the testator; the testator’s wife for several years had been an employee of one of the Franciscan Friars at St. Bonaventure
*968 University; illness had compelled her to cease her employment immediately before the wills were prepared; under her will, Mrs. Beckley provided for a legacy to the Friars at St. Bonaventure University; the testator and his wife were very close; the provisions for the bequest of the residuary estate of the testator’s will had been influenced by his wife’s position.
The attorney-scrivener testified that he knew the intention of the testator from his conversations with him. He swore on at least three occasions that he had been given specific direction that the residuary legacy was to be given to the "Franciscan Friars at St. Bonaventure, N.Y.” The emphasis of the direction of the testator was to geography and to location..
As to the phrasing employed in identifying the legatee, the attorney-scrivener testified: "If there is any inadvertence in the third paragraph or confusion as to its interpretation, it’s simply the manner in which I worded the phrase”. The attorney-scrivener testified that he had not known that there was a separate friary that operated in connection with the seminary and was of the opinion that the testator did not know that fact either, although the matter had not been specifically discussed.
Upon inquiry by the court as to whether the intent had been a legacy to individual Franciscan Friars, the attorney-scrivener testified: "The purpose was not to designate any particular Fathers or Priests to say the Masses. They did not want to burden them with the fact any particular person had to do the saying of the Masses. They wanted to make it general so as to cause no inconvenience. That is why they designated it Franciscan Fathers”. Expanding upon the answer, the attorney testified that the testator’s intent was that the intended beneficiary was collectively all the Franciscan Fathers, meaning the ordained priests of the Order of Friars Minor who were present at St. Bonaventure, New York, that being a geographic location.
The testimony of the executrix of the will, given without objection, corroborated that of the attorney-scrivener. She testified that she was a first cousin of the testator’s wife and a friend of the testator. As to the intended beneficiary, her testimony was as follows: "I believe Mr. Beckley wanted it to be paid to the Franciscan Fathers at Saint Bonaventure University, the Friary at St. Bonaventure University, New York. It isn’t the University. It’s St. Bonaventure, New York”.
To the question: Do you feel the intent of the testator was *969 that the friary, as a whole, get the money, or the friary at East Aurora, or the friary at St. Bonaventure University? Do you feel the locality was the important factor?
Her answer was: "I think it was the Friary at St. Bonaventure, New York, the locality”.
Her further testimony was that her family had given prior gifts to the Franciscan Fathers at St. Bonaventure, New York, and it was her belief that the testator and his wife both wished their bequests "to be made local”.
Upon inquiry if other parties wished to offer evidence, the court was advised as follows: The attorney for the University and the friary of St. Bonaventure stated that he was under instruction from his client not to participate in the proceeding or "to advocate any position one way or the other in the court’s decision in the matter”.
The attorney for the seminary and the friary of Christ the King advised the court that he was not participating "for the simple reason that my client and the Seminary and the Franciscan Fathers at the Seminary and St. Bonaventure and the Friary of St. Bonaventure and the Fathers there have entered into an agreement to settle this controversy”.
Proceedings were adjourned for the submission of a stipulation of facts concerning the date and time of incorporation of Christ the King Seminary as a separate corporate entity.
A stipulation of facts was subsequently submitted to the court. It stipulated that prior to August 8, 1961, the date of execution of the will in issue, to June 28, 1974, Christ the King Seminary had operated as a division or department of St. Bonaventure University at St. Bonaventure, New York; that on June 28, 1974, four months prior to the date of death of the decedent, which occurred on October 21, 1974, Christ the King Seminary became a separate educational corporation under the provisions of the Education Law; that a separate friary of Franciscan Fathers, known as the Friary of Christ the King had, prior to the execution of the will and at all times thereafter, been associated with the operation of the seminary separate and distinct from the friary of St. Bonaventure which operated in connection with the university.
Following submission of the stipulated facts, the court took the construction of the will under advisement and review. The court has taken judicial notice of the fact that St. Bonaventure, New York, is a locality with a separate post office *970 address and is distant no more than one mile from the limits of the City of Olean, the closest municipality.
The court first treats the issue of the appointment of a guardian ad litem for unknowns and the motion to dismiss such guardian and his report.
The language employed in the will to identify the residuary legatee or legatees is uncertain and equivocal. In the first instance, the number of beneficiaries intended was uncertain. Possibilities included: (1) the Franciscan Fathers; (2) Christ the King Seminary; (3) St. Bonaventure University, Olean, New York; or (4) a combination of such nominees.
Particular difficulty to the court attended the identity of "the Franciscan Fathers”. The range of possible beneficiaries that could satisfy that particular designation appeared to include at least the following: The Order of Friars Minor, a world-wide monastic order of the Catholic Church founded by St. Francis of Assisi in 1209; a divisional organizational entity of the Orders of Friars Minor embracing parts of North and South America known as the Province of the Holy Name; a subdivisional organizational entity of the Order of Friars Minor known as the Friary of Christ the King Seminary located initially at St. Bonaventure, New York, and later at East Aurora, New York; a subdivisional organizational entity of the Order of Friars Minor known as the Friary of St. Bonaventure University located at St. Bonaventure, New York; both such subdivisional friaries; the individual Franciscan priests who were members of the Friary of St. Bonaventure University; the individual Franciscan priests who were members of the Friary of Christ the King Seminary; the individual Franciscan priests who comprised the membership of both such friaries.
SCPA 103 (subd 37) defines persons under disability. The definition includes "any person who is * * * (d) unknown or whose whereabouts are unknown”. (Italics added.)
SCPA 403 (subd 2) deals with the appointment by the court of a guardian ad litem for persons under disability. It provides: "[a] person under disability who does not appear by his guardian or committee pursuant to 402 shall except as otherwise expressly provided appear by a guardian ad litem appointed by the court on nomination or on its own initiative whenever such person is a necessary party or for other reason the court deems it necessary to appoint a guardian ad litem to protect the interests of such party”. (Emphasis added.)
*971 In speaking of SCPA 403 it is said: "Neither the former statute [Surrogate’s Court Act, §64] nor the present statute was specific as to the cases in which it must be applied. To a large extent unquestionably its application is discretionary with the Surrogate”. (1A Warren’s Heaton, Surrogates’ Court, § 79, subd 1, par [e].)
Exercising its discretion, the court appointed a guardian ad litem for unknowns. In doing so the court was prompted by a desire to determine what parties might have an interest in the residuary estate and where they were. Because of the extensive number of initially possible interested parties, it seemed advisable to cause investigation to be made to delimit them if possible and to determine if they lacked capacity to take a disposition for the religious, charitable and benevolent purpose provided in the residuary legacy. The court wanted information on which it could make an independent judgment of the need for representation on the variously proposed agreements to compromise and procedures which should be followed, and whether all parties were properly represented.
The appointment of the guardian ad litem for unknowns was not made by the court until after the Attorney-General, earlier made a party on the court’s initiative, failed to appear and participate in the proceedings. His failure to appear continued for three successive occasions and this despite solicitation by the court for an appearance and advice.
The court has never questioned the authority of the Attorney-General to represent the beneficiaries of a testamentary disposition for religious, charitable, educational or benevolent purposes. This is his statutory right. (EPTL 8-1.1, subd [f].) However, the same statute imposes a "duty [on him] to enforce the rights of such beneficiaries by appropriate proceedings in the courts”. This, in the judgment of the court, he failed to do.
A further consideration prompting the appointment of the guardian ad litem stemmed from the outstanding possibility that the bequest might be construed to have been made to the Franciscan priests in their individual capacity. In such instance it has been held that the bequest is not charitable in nature so as to qualify for a charitable deduction under the Internal Revenue Code and this even if the priest, as recipient of a bequest for Masses is bound by vow to say the Masses and is obligated to deliver the bequest to the church. (Cox v Commissioner of Internal Revenue, 297 F2d 36; Matter of *972 Lamson v United States, 338 F2d 376; Matter of Barry v Commissioner of Internal Revenue, 311 F2d 681, holding that in the instance of such a bequest the priest is not a constructive trustee for his church.) The theory of these cases is that the bequest reaches the church not by direct gift from the testator, but indirectly via the vows and obligations of the priest. Whether the Attorney-General as statutory representative of beneficiaries of dispositions for charitable and religious purposes under EPTL 8-1.1 (subd [f]) is a proper representative of a priest who takes a legacy for Masses in an individual capacity is a matter which does not appear to have been resolved.
The court confesses that it also entertained some lingering doubt as to the exclusiveness of representation by the Attorney-General of beneficiaries who lack capacity to take a bequest for a religious, charitable, educational or benevolent purpose. In the event of the necessity of a "cy pres” application for charitable bequests, is the Attorney-General the single proper legal representative for all alternative and competing charitable beneficiaries? This question also does not appear to have been resolved. This court does not attempt to resolve either of the noted questions. They are set forth only as supportive of the discretionary action of the court in appointing a guardian ad litem for unknowns. The court’s concern over the noted matters is not afterthought, it was made known by letter to the attorneys for all appearing parties. Note is also made that there proved to be Franciscan Fathers who, as members of the two friaries concerned were possible individual trustee beneficiaries on the death of the testator, but who at the time of distribution were no longer able to say Masses or fulfill the purposes of the trust by reason of death, resignation or having been laicized. For all the reasons noted, it simply seemed best to the court at the time to assure active legal representation for all possible parties in interest.
The investigation by the guardian ad litem for unknowns was thorough. His report was comprehensive and objective. It met fully the requirements of special court rule IX of the Cattaraugus County Surrogate Court Rules which required him to "carefully examine all matters in the proceeding affecting the interests” (former 22 NYCRR 2250.9) of the persons he represented. His work and his efforts were helpful to the court and merit note and commendation.
Under all the facts and circumstances existing, the attorney *973 for the Friary of Christ the King Seminary and the Assistant Attorney-General have failed to satisfy this court that its discretion in protecting the interests of "persons unknown or persons whose whereabouts were unknown” was not properly exercised. The decision and language in Matter of Schultz (180 Misc 1023, 1024-1025, affd 268 App Div 966) is applicable and appropriate. There, the court refused to dismiss a special guardian in an action in which the alien property custodian was given the statutory right to appear. The court said: "While in some set of circumstances there may be overlapping of appearances, that is not an unmixed evil * * * [i]n fact it may be essential to the protection of all the rights involved * * * [t]he appearance of the special guardian will not be stricken out. He is here on the court’s own direction for the protection of interests which the court deems to be entitled to special protection until the inquiry into the validity of the propounded instrument is completed”. (See, also, Matter of Keutgen, 194 Misc 815, which cites and follows Matter of Schultz.)
Next in order is a review of the procedural aspects of the motion to require the court to confirm the agreement of compromise. The basis of that motion is shadowed in doubt. No statute was ever cited in oral argument.
In the memorandum submitted to the court in support of the motion for judicial approval of the compromise agreement, the attorney for the moving party failed to specify any statutory authorization for the motion. His written argument, like his oral argument, consisted of a bare and oft-repeated insistence on an obligation of the court to approve the compromise which he had helped to engineer.
The research of the court discloses three statutes which could have possible application to the motion. Their provisions are reviewed and measured against the proceedings attending the motion in issue.
SCPA 2106 (subd 1) provides for a proceeding for compromise of controversies between claimants to property "[w]here the interests of persons under disability or not in being are or may be affected”.
At the time the agreement of compromise was submitted to the court and an oral motion made for its approval, there were unknowns. By definition, unknowns are persons under disability. (SCPA 103, subd 37, par [d].) Persons under disability are statutorily made "necessary parties” to proceedings for *974 compromise. (SCPA 2106, subd 2.) As statutorily required, the unknowns were represented by a guardian ad litem appointed by the court. (SCPA 2106, subd 2.) That guardian ad litem for unknowns was not a signator to the agreement; nor did he support the motion for approval. As a necessary party, his absence constituted one procedural deficiency. (See 5 Warren’s Heaton, Surrogates’ Court, § 470, subd 1.)
Further, the statute provides that it is the "fiduciary [who may seek] authorization to compromise any controversy”. (SCPA 2106, subd 1, par [a].) The fiduciary here was the executrix. She was not a signator to the agreement; nor did she join in the oral motion for approval of that agreement. The best, or the worst that can be said of her position was a willingness "to go along” with what others decided subject to the approval of the court. Her failure to seek authorization of the compromise agreement was a second deficiency. (See 5 Warren’s Heaton, Surrogates’ Court, § 469, subd 5; § 470, subd 1.)
In addition, the procedure under the statute requires that the proceeding be instituted by a verified petition by the fiduciary. (SCPA 2106, subd 5.) There was no verified petition. In truth, there was no petition of any kind made by anyone. That is a fourth deficiency.
Fifth and finally, the strenuous objection of the attorney for the moving party to the attempt of the court to inquire into the facts surrounding the alleged agreement of compromise is in direct opposition to that provision of the statute that mandates judicial inquiry. (See SCPA 2106, subd 7.)
In summary, at least five procedural defects exist to the application of SCPA 2106, if that is the statute under which the motion for approval was made.
SCPA 1813 also provides a procedure for compromise of claims. In contrast to SCPA 2106, it is applicable where persons under disability are not affected.
A proceeding under SCPA 1813 is to be instituted "[u]pon the application of a fiduciary” (SCPA 1813, subd 1). There was an absence of any application to the court by the executrix-fiduciary in the case for decision.
While SCPA 1813 is silent on the matter, authoritative text recites that application for authority to compromise a claim under that statute should be made on petition. (3A Warren’s *975 Heaton, Surrogates’ Court, § 282, subd 2.) There was no petition.
The need for evidence of a compromise under SCPA 1813 is stated textually as follows: "It has been held that on the application for a compromise the same evidence should be produced before the court as would be required to sustain the compromise if it was attacked on the accounting. Matter of Richardson, 9 N.Y. Supp. 638. This seems clearly to be the proper rule”. (3A Warren’s Heaton, Surrogates’ Court, § 282, subd 2, par e.)
Further, the procedure under SCPA 1813 leaves the issue of notice to the court to determine. (SCPA 1813, subd 1.) The objection of the attorney for the moving party to the court’s insistence that notice be given to the guardian ad litem for unknowns and the right of that guardian to participate in the proceeding was an objection to the statutory right of the court to determine to what persons and in what manner notice of the proposed compromise was to be given.
Finally, the approval by the court to a proposed compromise under SCPA 1813 is to be "for good cause shown”. (SCPA 1813, subd 1; Matter of Daly, 152 Misc 210.) The insistence of the attorney for the moving party that the court judicially approve the proposed agreement of compromise without developing the findings of facts and supporting reasons was an insistence that the court abrogate a statutory duty of inquiry.
The court draws the conclusion that if SCPA 1813 was the basis for the motion for approval of the agreement of compromise, there were also numerous procedural deficiencies.
CPLR 2104 is the third and last discovered statute under which a motion for approval of the agreement of compromise might be made. This statute relates generally to all stipulations. Its application to the compromise in issue is extremely doubtful since as indicated, other procedures are provided under the Surrogate’s Court Procedure Act. It is the absence of procedures under the SCPA that is a sine qua non to the application of procedures under the CPLR. (SCPA 102.) Nevertheless, even as a remotely possible basis for the motion, it is examined.
CPLR 2104 defines a stipulation as an "agreement between parties or their attorneys”. It provides that a stipulation is not binding upon a party unless it is in a writing and subscribed by the party or his attorney, or alternatively is reduced to the form of an order and entered.
*976 While stipulations of settlement are common and generally favored in the law, there are limitations on their application.
The agreement submitted to the court for an order of approval is that the property constituting the residuary estate of the decedent "shall be transferred and paid over to the Friary of St. Bonaventure University and the Friary of Christ the King Seminary, in compromise of the construction proceedings, and a decree may be made and entered in accordance thereto”.
A casual reading of this agreement discloses that only four of the interested parties seek to direct the duty of the executrix. She is the only person in a position to transfer and pay over the residuary property of the decedent. Yet the executrix was not a signator to the written agreement, nor was she a party to the motion for its approval. She has never moved or petitioned to have the construction proceeding which she instituted terminated. Her position was to leave it to the court for a determination. Note is also made that the guardian ad litem for unknowns was not a party to the agreement, nor to the motion. Neither was the Attorney-General a signator to the agreement. His position, however, is made somewhat equivocal by virtue of the fact that when he finally appeared in the proceeding, he joined in the motion for approval of the agreement.
It has long been held that an agreement of stipulation is not binding on those who are not parties to it. Nor are such persons bound by a judgment or decree entered on such a stipulation. (Bowler v Apex Bldrs., 259 App Div 834; 2 Carmody-Wait 2d, NY Prac, Stipulations, § 7:18 and cases cited.)
The overriding and decisive provisions of the agreement and of the motion for its approval are that it seeks to control the activities of the court. It does this by requiring termination of the construction proceeding pending before the court and on terms not agreed to by all appearing parties, nor by the court. It also seeks to compel the court to sign and enter a judicial decree approving the same. If no discretion resides in the court concerning approval, one can only wonder why judicial approval of the agreement was sought by the attorney for the Friary of Christ the King and the Assistant Attorney-General. A rubber stamp would seem to provide a sufficient alternative.
Parties cannot control the activities of a court by stipulation. That is the decision of this court. In the opinion of the court it was the decision in Cowen v King (54 App Div 331). *977 There, in contrast to the case at bar, the fiduciary, a trustee for the benefit of creditors, had entered into a stipulation with other parties. However, it was without judicial approval. The stipulation was for the disbursement of moneys realized on a mortgage foreclosure. Even with the fiduciary’s approval, the Appellate Division strongly censored the stipulation. The court stated in relevant part (pp 333-334):
"We do not think that the parties to a proceeding of this character should be allowed to stipulate as to the distribution of a fund in court so as to bind the court as to the distribution of the fund.
"In this connection it is also proper to consider the relation in which the appellant stood to this fund. He was a trustee for the benefit of creditors, and, occupying such a position, it is the duty of the court to protect the interests of those for whom he is trustee and not to permit improvident stipulations to deplete the fund * * * We wish to express our disapproval of such stipulations and to declare that the parties to such a proceeding are not authorized to enter into any stipulation which takes away from the court the power, vested in it by the Code of determining as to the amount of such costs and disbursements and by whom they shall be paid, and that no stipulation can bind the court as to the disposition of money in its possession, entered into without the approval of the courts (Emphasis added.) (See, also, in accord, Matter of Falvey, 7 AD2d 476; Matter of Fiscus, 45 AD2d 235, both later reviewed.)
The court reaches the conclusion that regardless of which possible statute the moving party belatedly selects as supportive of the motion for approval of the compromise agreement, the action that was taken before the court was procedurally defective. However, the court does not rest its decision on mere procedural deficiencies. It turns lastly to the issues of substantive law which have been raised.
The decision in Cowen v King points up the two issues of substance which have dominated this proceeding throughout. These issues are important for they reach the very foundation on which a probate court is founded. They touch the basic and essential rights of a testator. They test the most fundamental duties of a Surrogate Judge, an executor, and testamentary legatees. The first issue posed is: must a Surrogate’s Court forego inquiry into a proposed compromise for the disposition of the assets of a testator? The second issue posed is: must a *978 Surrogate’s Court approve a proposed compromise for the disposition of the assets of a testator when it appears upon inquiry that such disposition is contrary to the testator’s intent? The answer of this court to both issues posed is an unequivocal no!
On the first issue, this court holds that it is not only the right, but the duty of a Surrogate’s Court to inquire into the facts and circumstances surrounding an agreement for the disposition of a testator’s assets and that is true even if the executor and all parties interested are in accord. This, in the opinion of the court, was the decision reached in Matter of Falvey (7 AD2d 476, supra).
In Matter of Falvey, a Surrogate Court relying upon the facts recited in a petition which were not formally opposed construed the provisions of a will. The Appellate Division, speaking through Justice Williams, noted that the Surrogate had improperly treated the allegations of the petition as conclusory and not factual. In speaking of a statute (Surrogate’s Ct Act, § 76) which provided that the petition became due proof of the facts therein stated if not controverted, the court said (p 481): "Moreover, that section does not necessarily relieve the Surrogate of ascertaining the true facts and circumstances in a proceeding such as this even though no request was made by any party concerned that he take testimony. This he should have done of his own volition, particularly when there were indefinite and uncertain charitable residuary beneñciaries who obviously required protection ”, (Emphasis added.)
Matter of Fiscus (45 AD2d 235, supra) even more recently points up the obligation of the court to make something more than a perfunctory investigation into proposed agreements of compromise.
This court regards the decisions of Matter of Falvey and Matter of Fiscus as ones which properly state the applicable law. As decisions of the Fourth Judicial Department they are regarded as binding on this court.
Further support for the holding made on the first issue posed is found in Matter of Sidman (154 Misc 675). In treating the question of the obligation of the Surrogate to inquire into a compromise agreement, Surrogate Wingate noted there was a special obligation on the Surrogate when the question at issue concerns the validity of a will, or the method of devolution of property thereunder (p 679).
*979 On the second issue posed, the court holds that an agreement of compromise and settlement, even if executed by the executor and all interested parties, cannot permit, much less require, judicial approval that would defeat a testator’s disposition of his property and his discovered intent in relation thereto.
The reason offered in support of this second holding is the commonsense proposition that if the law were otherwise, the transfer of property upon death could and likely would be effected by an agreement of surviving claimants in the place and stead of a will of the deceased. As the learned Surrogate in Matter of Wadsworth (142 Misc 717, 723-724) so cogently observed, the consequence would be that: "the making of a will would be an empty and useless formality. No testator could have any assurance that he would have anything whatever to say as to what should be done with his property or to whom it should go. All wills would then in the last analysis be subject to reduction to the common formula — I leave all of my property to such disposition as my distributees see fit to make of it — subject only to the approval of the surrogate. The desires and intents of the distributees would be substituted for the desire and intent of the testator and would be controlling, subject always to the approval of the surrogate. The intent of the testator would become of little or no importance.” This court does not propose to abrogate the statute of wills for the purpose of approving an agreement reached by competing legatees.
The decision in Matter of Wadsworth (142 Misc 717) by the unanimous affirmance of the Appellate Division, Fourth Department (236 App Div 712) is also regarded as binding on this court. The relevance of that affirmed decision to the one in issue merits a detailed review.
In Matter of Wadsworth, a hearing was held on a proceeding for construction of a will. Following the hearing, the fiduciary, there a trustee, entered into a stipulation for the disposition of the testator’s assets. As in the instant case, application was made to the court for approval. Approval was denied by the court after inquiry by a hearing and a resulting judicial determination that the facts and circumstances developed disclosed no merit to the objection filed and did not justify the fiduciary’s approval of the compromise agreement.
Particularly relevant to the case in issue was the court’s view of an acquiescent, condescending and less than resolute *980 fiduciary (supra, p 723): "I do not believe that the facts and circumstances as brought out by the inquiry and upon the hearing justify the trustee in having entered into the said agreement, even if the right to do so had existed. I believe that it is the trustee’s duty to support rather than to practically abandon the trust and I cannot approve the trustee’s position. Following the line of least resistance is not always the proper course”. (Emphasis added.)
The court also reviewed the extent to which compromise should extend in thwarting testamentary dispositions and the tests which should be judicially employed in reviewing a proposed compromise. In speaking of a statute which authorized compromise of claims (Decedent Estate Law, former § 19, predecessor to EPTL 13-1.4, which relates to compromise agreements in Supreme Court, and incorporates in Supreme Court determinations the provisions of SCPA 2106), the court cogently observed (p 723): "The intent and purpose of the statute, it seems to me, is not primarily to defeat the expressed direction of a decedent as to the disposition to be made of his property because his relatives are dissatisfied with the disposition thereof made by him, but rather to provide a means of compromising and settling real and bona fide difficulties and differences and disputes and controversies existing or arising between different interests concerning which bona fide and extended litigation is pending or threatened. The statute is founded upon common sense and, in support of public policy, favors the avoidance of litigation, but does not, I believe favor the defeat of a testator’s disposition of his property and his intent in relation thereto except for real and substantial reasons.”
Other tests for the approval of an agreement of compromise have been judicially noted. Many are summarized in Matter of Sidman (154 Misc 675, 678, 679, supra). There (p 678), Surrogate Wingate noted a requirement that there must exist a dispute which is "'a real, unfeigned, actual contention’” between the parties (emphasis added). (Citing Woodfin v Phoebus, 30 F 289, 292.) Essential to the validity of a compromise he observed is "that the alleged dispute be not 'wholly destitute of color or foundation or not made in good faith’”. (Emphasis added.) (Citing Feeter v Weber, 78 NY 334, 338.) Further, the " 'controversy’ should present a dispute the outcome of which might reasonably be deemed doubtful”. (Citing *981 Dolcher v Fry, 37 Barb 152, 157; Russell v Cook, 3 Hill 504, 506; Guggenheim v Guggenheim, 168 NYS 209, 210.)
The learned Surrogate emphasized especially the requirement of a questionable outcome in such instance as is presented in the case at bar. "When the questionable issue concerns the validity of a will or the method of devolution of property thereunder, it is especially obligatory upon the court to see to it that the dispute which is advanced as a basis for modifying or thwarting the testamentary wish affords a tangible possibility for the attainment of diverse results” (p 679, emphasis added). He then noted with approval, praise and quotation, the tests of a bona fide dispute and questionable result laid down in Matter of Wadsworth (142 Misc 717, 723, affd 236 App Div 712, supra).
Matter of Meyers (21 NYS2d 460, aifd without opn 261 App Div 982) quoted and followed the decision in Matter of Wads-worth. In Matter of Jeffries (155 Misc 464, 466, aifd without opn 247 App Div 747), Surrogate Wingate stated the test was one which was "fair to the decedent in view of all the surrounding circumstances” (emphasis added), and in Matter of Perlmutter (156 Misc 571) Surrogate Wingate noted that the reasons and circumstances for the compromise must be referred to the court.
More recently, while it did not cite Matter of Wadsworth, the Appellate Division, Fourth Department, citing Matter of Smith (75 Misc 2d 895), nevertheless, again reached the conclusion earlier reached in Matter of Wadsworth, that requirements for judicial approval of a compromise are "a bona fide controversy with doubt as to the eventual outcome”. (Matter of Fiscus, 45 AD2d 235, 238, supra.)
The dispute advanced by the moving party was that it was the intent of the testator that the entire residuary estate should be paid to the Friary of Christ the King Seminary. The evidence produced upon the construction proceeding does not support a tangible possibility for the attainment of that diverse result. On the contrary, it negatives it completely.
Further, the positions asserted by the Friary of St. Bonaventure and by the Friary of Christ the King Seminary, and by the Attorney-General, were marked with equivocation and change.
The attorney for the Friary of St. Bonaventure first took the position that the entire residuary estate belonged to that entity. Following a conference he then inexplicably agreed *982 with the position of the attorney for the Friary of Christ the King, that the entire residuary estate should be paid over to that entity. The attorney for the Friary of Christ the King Seminary assured the court that an agreement to that end would be presented to the court with the approval of the Friary of St. Bonaventure and the Attorney-General. No such agreement was ever presented; nor does it appear that any agreement making such disposition was ever signed. When he finally appeared, the court questioned the Assistant Attorney-General at length concerning his alleged approval of a disposition providing for payment in toto to the Friary of Christ the King Seminary. The Assistant Attorney-General never definitively answered whether or not he had approved such an agreement as was represented to the court by the attorney for that Friary. What the Assistant Attorney-General did was point with questionable pride to a letter which he had forwarded to the court in lieu of his appearance, advising in the letter that he had approved a settlement agreement with no indication of the terms thereof. So far as advice to the court, the position of the Attorney-General was kept a well guarded secret. It was against this background that the agreement providing for payment equally to both friaries was actually presented to the court and motion made for its approval.
As Surrogate Wingate observed, the only adjustment which a court can approve is an agreement of "compromise”. "Compromise, is the final word of importance”. "The meaning universally attributed to this term is an 'adjustment of matters in dispute, by mutual concession without resort to law’ ”. (Matter of Sidman, 154 Misc 675, 680, supra [citing cases in several jurisdictions].)
Not only the many vacillations of the parties to the compromise, but the extent of such vacillations, ranging from claims to all, to nothing, to half of the residuary estate, raised suspicion of the bona ñdes attending the dispute, and whether they were fair to the decedent. Such vacillations made questionable the existence of any mutual concessions to resolve the dispute. They suggested more an arbitrary decision reached by something comparable to "cutting up Jacob’s Coat”.
The initial position of the executrix and her attorney was certain — the entire residuary estate was intended for the Friary of St. Bonaventure. So resolute and unwavering were they in this view that even the addition of the Seminary and the Friary of Christ the King as parties was opposed as wholly *983 unnecessary. A later intermediate announcement of a willingness to accept, but not to seek, compromises providing for either payment in part, or in whole to another beneficiary was counter-productive if its purpose was to settle troubled waters. It merely fueled the fires of contention.
Whether their original resolve was sapped by protracted proceedings, enfeebled by a desire to have the matter brought to an early conclusion, or eroded by embarrassment and the resulting consequence of an understandably imperfect description of legatee, or otherwise, it was, nevertheless, improper. It was improper because it thwarted the testamentary intent of the testator — intent which each knew, which each had earlier asserted orally and in writing and concerning which each ultimately testified under oath.
Even if unopposed, a particular construction of a will cannot be determined upon mere consent. (Matter of Israelite, 155 Misc 259.)
Overlooked completely by the parties, in the judgment of the court, was the legal proposition that "a power to compromise does not include a power to make presents”. (Emphasis added.) (Mercantile Inv. & Gen. Trust Co. v International Co., L.R [1893] 1 Ch 484, 489 [Lindly, L. J.] quoted with approval in Matter of Sidman, 154 Misc 675, 680, supra.)
Even a compromise prompted by such noble motivation as a desire for brotherly peace and founded on consideration of Franciscan charity cannot be approved when it thwarts the intent of a testator. Our Court of Appeals has so repeatedly announced testamentary intent to be the dominant, overriding and paramount consideration that citation is unnecessary. That proposition, applicable where the compromising parties are personally benefited, is all the more applicable when the parties that benefit by the compromise stand in the fiduciary capacity of trustees of an "honorary trust”, i.e., a trust which has a definite purpose, but has "no one who as beneficiary can enforce the purpose of the testator”. (II Scott, Law of Trusts [3d ed, 1967], p 937; 9B Rohan, NY Civ Prac, par 8-1.5[2].) The court determines that the residuary legacy here in issue was bequeathed for the purpose of the celebration of Masses. It was of a charitable nature. It constituted a bequest to an honorary trust. (Matter of Morris, 227 NY 141; Matter of Lawless, 194 Misc 844, affd 277 App Div 1045; 9 Scott, Trusts [2d ed], § 371.5; 9B Rohan, NY Civ Prac, par 8-1.5[2] and cases *984 cited. See, also, Seventy Years of Bequests for Masses in New York Courts, 23 Fordham L Rev 147.)
It is not only the executor and the Attorney-General, but the court as well that has an obligation to protect charitable residuary beneficiaries. (Matter of Falvey, 7 AD2d 476, supra; Cowen v King, 54 App Div 331, supra; Matter of Fiscus, 45 AD2d 235, supra; and, see, Matter of Andrus, 85 Misc 2d 1062.)
This court cannot dispel the fundamental proposition that the property bequeathed was earned by the testator. It was his to give, and for whatever legal purpose, and to whom he chose. On construction the court determines that the decedent chose those Franciscan fathers who collectively constitute the Friary of St. Bonaventure at St. Bonaventure, New York. It further determines that the residuary estate of the decedent passes to that friary in trust for the authorized and charitable purpose of having the Franciscan fathers who constitute the friary celebrate Masses for the spiritual benefit of the decedent and his wife.
The motion for approval of the agreement of compromise is denied.